UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

VARNEL M. GLOVER, individually,      )      NO.   CV-04-0204-LRS
                                     )
                Plaintiff,           )
                                     )      ORDER DENYING MOTION FOR RULE
        -vs-                         )      56(f) CONTINUANCE; GRANTING
                                     )      IN PART MOTION TO STRIKE;
                                     )      DENYING IN PART AND GRANTING
AMERICAN BUILDING MAINTENANCE        )      IN PART SUMMARY JUDGMENT
COMPANY-WEST, a California           )
corporation; ABM JANITORIAL          )
SERVICES, INC., a wholly owned       )
subsidiary; PETER CAIN and JANE      )
DOE CAIN, and the marital            )
community thereof,                   )
                                     )
                Defendants.          )
_____    )

     BEFORE THE COURT ARE Defendants' Motion for Summary Judgment (Ct. Rec.
55), Plaintiff's Motion for 56(f) Continuance (Ct. Rec. 88), and
Defendants' Motion to Strike Inadmissible Evidence (Ct. Rec. 101). The
Court heard oral argument on July 28, 2005 and thereafter, ruled, in
part, on the record. This Order is intended to memorialize and
supplement the oral rulings of the Court.

///

///

ORDER - 1

**I.      MOTION FOR 56(F) CONTINUANCE (CT. REC. 88)**

Plaintiff's motion for continuance pursuant to Fed.R.Civ.P. 56(f) is **DENIED** as **MOOT** as plaintiff has been permitted to obtain and submit the discovery sought in that motion in advance of the Court's consideration of the pending motion for summary judgment.

**II.     MOTION TO STRIKE INADMISSIBLE EVIDENCE (CT. REC. 101)**

Defendants have moved to strike portions of the Declaration of Cheryl Forbes and the Declaration of Jim Thomas, filed by the plaintiff in opposition to the motion for summary judgment. Only admissible evidence may be considered on summary judgment. Declarations and exhibits are relevant to the extent they have a tendency to make the existence of any material fact more or less probable. See Fed.R.Evid. 401. Affidavits are admissible only if relevant and based upon personal knowledge. Conclusory facts cannot be utilized on summary judgment.   Fed.R.Civ.P. 56(e).

   **A.  Defendants' Request to Strike Statements Contained in Declaration of Cheryl Forbes**

The Court finds the following statements are inadmissible based upon their conclusory nature, their lack of relevance and/or the affiant's lack of demonstrated personal knowledge.  The Court does not consider the following statements for purposes of summary judgment:

1.  ¶ 8: "My experience with ABMI, is that you are treated differently if you are anything but a white male."
2.  ¶ 8: "Mr. Cain simply does not like anyone who does not fit his mold of 'American, white male."
3.  ¶ 8: "The white male managers created an atmosphere that was rife with racial and sexual harassment."
4.  ¶ 10: "....ABMI was forcing me out of my position."
5.  ¶ 12: "I was forced to take a medical leave of absence due to the harassment I myself was facing at ABMI."
6.  ¶ 13: Glover was fired "because he was black."

The Court **DENIES** the defendants' request to strike the following statement:

7.    ¶ 9: "I repeatedly heard Mr. Cain make racist comments."

**B.    Defendants' Request to Strike Ebonics Document attached to Forbes Declaration**

After Glover's employment ended, Cheryl Forbes gave Glover a document titled "Ebonics." Ms. Forbes declares she was given the document by another ABM employee, Colleen Meyers, after Forbes' employment at ABM had ended. Ms. Forbes understood that Meyers had been told by somebody else at ABM that Mr. Cain had allegedly passed around the document. Ms. Forbes had never seen Cain hand out the document to anyone while she was an employee of ABM. Cain denies having ever passed the document around, though he admittedly recalled having seen the document before but he didn't know where. Jackowich Decl, Ex. B, Cain Deposition at 115 - 117.

The Court finds the proffered Ebonics document inadmissible. Plaintiff has not provided adequate foundation for the admission of this document. Documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment. *Canada v. Blain's Helicopters Inc.*, 831 F.2d 920, 925 (9th Cir. 1987). In order to be properly authenticated, a witness with personal knowledge of the facts sufficient to attest to the identity and accuracy of the contents must so declare. *U.S. v. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). The Forbes Declaration relies upon inadmissible hearsay statements to support the admission of this document. Accordingly, adequate foundation has not been laid.

**C. Defendants' Motion to Strike the Thomas Declaration**

On June 10, 2005 plaintiff supplemented his motion for summary judgment by filing a declaration of Jim Thomas, who came to know Peter Cain and Varnel Glover during his work with the Spokane Transit Authority which contracted with ABM to provide janitorial services. In his declaration, Mr. Thomas claims that in approximately 1999 or 2000, though conversations with Cain, he learned that Cain was attempting to obtain several contracts with customers in Priest River, Idaho, where Thomas resided. Thomas alleges Cain discussed with him "having difficulties with black supervisors in Spokane." Thomas Decl. ¶¶7, 8. Thomas also claimed Cain had indicated "he wished that he could move one of the supervisors up to Priest River to get him out of the way, but that he doubted he could get away with that in North Idaho." Thomas Decl. ¶ 8. Thomas claims Cain told him he was lucky he lived in Idaho "since there were no blacks there and we did not have to deal with those problems." Thomas Decl. ¶ 8.

Five days following the filing of his declaration, Thomas was deposed. During his deposition Thomas could not recall when the conversations occurred[1], though it was his best guess that Cain made such statements at the time co-branch manager Cheryl Forbes left, or within six months of her departure. This answer was given after plaintiff's counsel mistakenly represented to Thomas that Ms. Forbes' last working days were in 1996, when she actually left in July 1997.

---

[1] In fact he stated, "I have not a clue of the time frame of when [Cain] was up there." Palmer Decl., Ct. Rec. 126, Thomas Deposition at 9.

ORDER - 4

1    Defendants contend the Court should strike the Declaration of Jim

2  Thomas arguing there are material inconsistencies between the declaration

3  and his deposition primarily concerning the date when these conversations

4  took place. The Court recognizes that a party may not create his own

5  issue of fact by an affidavit contradicting deposition testimony. While

6  the Thomas testimony raises issues as to when the Thomas-Cain

7  conversations took place, the Court considers this discrepancy relatively

8  minor considering Thomas' testimony was clearly that he in fact "had no

9  clue of the time frame." The Court denies defendants' request to strike

10 the Thomas Declaration. The Court finds the challenged inconsistencies

11 go to the credibility of the witnesses statements and the weight to be

12 given to the testimony, not the admissibility of his testimony.

13 **III. FACTS**

14    The following facts are undisputed, unless indicated otherwise.

15    ABM Janitorial Services employs approximately 50,000 employees. ABM

16 Janitorial Services [ABM] reports as an operating division of ABM

17 Industries, Inc. on that company's financial statements. Defendants'

18 Statement of Material Facts ["DSMF"] ¶ 1. The President of ABM is James

19 P. McClure. ABM has 10 separate divisions, each of which has a Regional

20 Executive who reports to McClure. The Northwest Region is one of the

21 regions. Jack Smith is the Senior Vice President or the Northwest

22 Region. Included in the Northwest Region, is the Spokane, Washington

23 branch. The Spokane branch is a janitorial business providing janitorial

24 services to business throughout the Spokane area.

25    Defendant Peter Cain is a white male who has been employed with ABM

26

for 23 years.  He has been the sole branch manager of the ABM Spokane branch since 1997.

Plaintiff Varnel Glover is a 52 year old African-American male.  Prior to working for ABM, Glover worked as a supervisor for a local janitorial firm, Allied Janitorial Services. Glover has never possessed a driver's license because he does not want to drive.

In 1993, Allied Janitorial Services was purchased by ABM and incorporated into ABM's Spokane Branch. The Branch Manager at that time was *Cheryl Forbes*.

Glover was hired in September 1993 by ABM's Spokane branch as a supervisor.  At the time of his hiring Forbes was aware Glover did not have a driver's license.  She wondered how that would work, but was assured by the Night Operations manager that it worked out fine, as he was assigned to locations he could walk/ride to work. Glover was rated an excellent supervisor by his managers and supervisors at ABM. "Virtually all" the night supervisors have a driver's license.  It is ordinarily needed as they on average need to get between 30-35 different accounts each night.  Glover never needed a license to perform his job. He would have tried to obtain a license if he knew it meant keeping his job.  Plaintiff's Statement of Material Facts ["PSMF"] ¶ 10.

In 1996, Cain became co-branch manager with Forbes. While co-branch manager, it is alleged Cain told several racist jokes to Forbes.  Forbes recalls him saying - "What do you call a 19 year old black man in fourth grade? Gifted."  and another time, while at a meeting in Sun Valley, "What do you call a black man in the tree with monkeys? Branch Manager." Cain denies making these statements.  Glover never heard Cain tell any

racial jokes.  Cain never directed any kind of racial statement toward Glover in person.  Glover testified he did not know of any manager or supervisor at ABM ever telling a racially derogatory joke. Glover was informed that Cain had made these jokes months after his employment had ended with ABM in October 2001.

In May 1997, Glover applied and was granted a one-year leave of absence in order to work the day shift at a Wal-Mart store.  Forbes went on a leave of absence in July 1997 and Peter Cain became the sole branch manager at that time.  Forbes never worked a shift for ABM after then, though her employment was terminated in early 1999.  During the period of time September 1995 - May 1997, Glover was not aware of any race discrimination being directed at him at ABM.

In April 1998, ABM was in danger of losing the Spokane County Courthouse complex contract due to poor performance of the janitorial staff.  Cain personally contacted Glover to ask him if he would consider returning to work for ABM as a supervisor in Spokane.  He offered him a position as a supervisor of the account at the Spokane County Courthouse and more money than he was making at his current job.  Cain knew Glover did not have a driver's license.  Glover accepted the position as an at-will employee.  He was the only African-American supervisor in the Spokane branch at ABM.  Glover could walk or take the bus to the Courthouse.

Glover and ABM supervisors were provided training by ABM that dealt with the topic of race discrimination.  Cain personally conducted some of those sessions.  Glover was provided ABM's March 1, 1999 memorandum informing all of its employees about its zero tolerance policy towards

employee harassment and identified a toll free number ABM employees could call to report any kind of discrimination.  ABM had affirmative action policies in place. In 1999, ABM adopted a policy to encourage the hiring and retention of minority candidates, which included offering flexible hours, which would aid with transportation difficulties and child care problems.   PSMF ¶ 8.

In February 1999, ABM's contract with the Spokane County Courthouse ended.  Glover was then assigned to work downtown, where he became responsible for supervising more than one building.  On March 15, 2000, Glover was given a performance appraisal by Cain, which indicating he was "meeting expectations" as an employee of ABM.  It was also noted that "Varnel is held back in advancement due solely to possess [sic] no driver's license. Should he achieve this, he is capable of advancement and promotions."  Under the heading "Employee" of the same review, Glover himself wrote: "My review was fine.  We had a good conversation about talking with DM's better, and getting me to drive, which I will try to do."

Glover remembers Cain "yelling" at him on two occasions - one prior to 2000 and one in 2000 - involving accounts supervised by Glover downtown at Sterling Savings Bank and River Park Square because the bank wasn't properly cleaned and the lights weren't coming on properly.  At no time was profanity or anything of personal nature stated against Glover.  Glover did not report the yelling incidents as he "did not think it was that big of a deal at the time."

Michael Lukenbill (Cain's direct supervisor) stated he used to tease Glover about not having a driver's license. Glover admits he made no

effort to obtain a driver's license thereafter. Glover was the only ABM supervisor in Spokane who did not have a driver's license.

A few months before Mr. Glover's employment ended at ABM in October 2001, Cain left a note in Glover's box saying he should get a driver's license. Allen Decl., Ex. A, Glover dep., pg 66 ll 25; p 67, ll 1-12. Cain wanted Glover to have a license. Glover was not explained (and did not ask) why or warned that the license was required to keep his job.

The largest single account that ABM's Janitorial Division had in 2001 was the Twin Towers at the World Trade Center ($75,000,000.00 in annual revenue). The September 11, 2001 terrorist attack and destruction of the Twin Towers and surrounding buildings, killed 17 ABM employees and "substantially damaged" the revenues of ABM. Following the attack, ABM President James McClure, issued a written directive dated October 24, 2001 instructing each and every regional office to cut personnel within each region by ten percent effective December 1, 2001. ABM Northwest Regional Manager Jack Smith notified ABM's Assistant Northwest Regional Manager, Lynn Swinyard, in approximately October 2001 of the need to make the reduction. Smith ordered the immediate ten percent reduction. Swinyard informed Cain of the directive. A decision was made by Swinyard and Cain to cut a supervisor position.

On October 31, 2001 Glover's employment was terminated. Cain informed Glover that the reason he was being laid off was because of the September 11 World Trade Center events. Cain admits he never told Glover that he needed to get a license to keep his job as a supervisor. In addition, he was never told he was fired because he did not have a license. The day after his termination Cain issued a memorandum indicating Glover had been

laid off "in response to ABM Industries directive for workforce reduction...."   PSMF ¶ 18. Cain informed Glover if something else came up in a supervisor position, Cain would contact him to come back.   In fact, in approximately January 2002, Cain contacted Glover about a potential position at ABM.  Absent the October 24, 2001 directive, Glover would not have been terminated.  DSMF ¶ 40.

No other supervisors were laid off in the Spokane branch, though Jessica Miller, who worked for ABM in Colville was terminated from a salary position and hired into an hourly position as a janitor/supervisor for that area, due to the 10% directive.   Throughout the Northwest Region, 14 other individuals were laid off of mixed races (10 Caucasians, 2 African-Americans, 1 Asian, 1 Native American).   Three of them, including Glover were night managers.  Besides Glover, there were three other employees who were laid off on October 31, 2001.  All others were laid off no later than November 15, 2001.

Lukenbill states Cain told him Glover was fired because he did not obtain a driver's license.   No mention of September 11th was made to Lukenbill by Cain, although Lukenbill stated he had no reason to know whether Cain had other reasons for terminating Glover in addition to not having a license. Cain also told Swinyard and HR Director for the Northwest Division, Charlie Jones (who reviewed and approved the selection of Glover to be laid off), that he had spoken with Glover previously about getting a driver's license and that the reason he selected Glover for layoff was his lack of driver's license.

Upon Glover's layoff, the downtown buildings he supervised were divided among the remaining ABM route supervisors, all of whom must have

driver's licenses because each of them drive ABM vehicles to multiple buildings per night to supervise the accounts and provide supplies.

Cain did not hire an African-American supervisor while he was branch manager at Spokane, other than Glover.  Between 1998 and 2004 he hired or promoted at least ten supervisors: 8 white, 1 asian, and 1 hispanic. ABM records show under Cain, the Spokane branch went from employing 16 African-American employees to four by fall 2005.  Two new supervisors were hired in the summer of 2001 - Mike Schultz and Linda Webber. Both were under ABM's 120-day probationary period when Glover was terminated. Both possessed driver's licenses.

ABM policy required Cain to submit a Workforce Analysis Form before terminating Glover.  Cain failed to do so.  The Northwest Region has never done so in connection with any personnel actions.  Other regions also did not complete such documentation. DSMF ¶ 28.

The first time Glover became aware of the driver's license explanation for his termination was in regards to Glover's application for unemployment. The first time Glover heard mentioned the 10% reduction directive was to the EEOC in April 2002, when Glover filed a complaint with the Washington State Human Rights Commission.

Joy Olson had worked at various times for ABM since 1981.  She was hired in April 2000 in Spokane as a janitor and promoted to supervisor in October 2000.  She possessed a driver's license and worked as a route supervisor until August 29, 2001, when she was assigned to the River Park Square account which had suffered from instability of personnel.  At this account she worked both as a janitor and supervisor.  Ms. Olsen earned

1  less than Glover.  Glover was not offered the position at the River Park
2  Square account.

3      Jim Thomas has declared that Peter Cain told him (during a disputed
4  time period) that he was having problems with black supervisors, that he
5  wanted to move the supervisor out of Spokane to North Idaho, and that
6  Thomas was lucky he lived in North Idaho because he "didn't have to deal
7  with black people up here."  Glover never heard Cain say this statement.

8  **IV.    ANALYSIS**

9      **A. Burden of Proof on Summary Judgment**

10     The summary judgment procedure is a method for promptly disposing of
11 actions. See Fed. R. Civ. Proc. 56. The judgment sought will be granted
12 if "there is no genuine issue as to any material fact and [ ] the moving
13 party is entitled to judgment as a matter of law." Fed. R. Civ. Proc
14 56(c). "[A] moving party without the ultimate burden of persuasion at
15 trial [ ] may carry its initial burden of production by either of two
16 methods. The moving party may produce evidence negating an essential
17 element of the nonmoving party's case, or, after suitable discovery, the
18 moving party may show that the nonmoving party does not have enough
19 evidence of an essential element of its claim or defense to carry its
20 ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co.,*
21 *Ltd., v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir.2000). If the
22 movant meets its burden, the nonmoving party must come forward with
23 specific facts demonstrating a genuine factual issue for trial.
24 *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,
25 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

26

If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In opposing summary judgment, the nonmoving party may not rest on his pleadings. He "must produce at least some 'significant probative evidence tending to support the complaint.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting *First Nat'l Bank v. Cities Serv*. Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The Court does not make credibility determinations with respect to evidence offered, and is required to draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31 (citing *Matsushita*, 475 U.S. at 587). Summary judgment is therefore not appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts...." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th Cir.1980).

**B.   Race Discrimination**

**1. <u>Discriminatory Discharge</u>**

Glover alleges that he was fired from his job at ABM based on racial considerations, a violation of 42 U.S.C. § 1981 and RCW 49.60, the Washington Law Against Discrimination ["WLAD"].  Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the WLAD, all make it unlawful for employers to discharge or bar any person from employment because of race.  Because Washington courts look to federal law when analyzing

ORDER - 13

retaliation claims, the Court considers Glover's Washington state law claim and federal claim together. *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002); *Graves v. Dep't of Game*, 76 Wash.App. 705, 887 P.2d 424, 428 (1994).    The United States Supreme Court has held that the test for intentional discrimination in § 1981 actions is the same formulation used in Title VII discriminatory treatment cases.  *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

When responding to a summary judgment motion, the plaintiff in an intentional discrimination case is presented with a choice regarding how to establish his or her case.  Plaintiff may choose the pretext method, which was established *by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),* where the plaintiff must initially establish a prima facie case of unlawful discrimination. If the plaintiff establishes a prima facie case, a rebuttable presumption that the employer unlawfully discriminated against is created.  The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. If the defendant articulates such a reason, the presumption of unlawful discrimination "simply drops out of the picture" and the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason is not its true reason, but is a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Once evidence supporting a prima facie case of employment discrimination and pretext has been presented, and "the record contains reasonable but competing inferences of both

discrimination and nondiscrimination, 'it is the jury's task to choose between such inferences.'" *Hill*, 144 Wn.2d at 186, citing *Carle v. McChord Credit Union*, 65 Wn.App. 93, 102, 827 P.2d 1070 (1992) (other citations omitted); *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 147-48 (2000).

Although the *McDonnell Douglas* burden shifting framework is a useful "tool to assist plaintiffs at the summary judgment stage so that they may reach trial," "nothing compels the parties to invoke the McDonnell Douglas presumption." *Costa v. Desert Palace*, 299 F.3d 838, 855 (9th Cir. 2003). The assessment of whether *McDonnell Douglas* should be applied is dependent on the particular facts of the case. *Id* (noting that plaintiff may succeed by introducing "other sufficient evidence--direct or circumstantial--of discriminatory intent"). A plaintiff may also choose to simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer's decision. *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2002). Alternatively, under the mixed-motive[2] method of proof, the plaintiff may avoid summary judgment by introducing sufficient direct or circumstantial evidence that race was "a motivating factor" in the employment decision, not necessarily the sole factor. *Desert Palace Inc. v. Costa*, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)(discussing mixed-motives theory of liability under Title VII).

---

[2] In a "mixed motive" case, the plaintiff alleges that a discriminatory factor appears to be one of the considerations motivating the adverse employment action. In a "single motive" case, the plaintiff alleges that it was the only reason for the action.

The question becomes which framework should apply.[3] *See Costa v. Desert Palace*, 299 F.3d 838, 852-53 (9th Cir. 2002)(reviewing the case law and describing it as a "quagmire that defies characterization," "chaos" and a "morass"). Plaintiff has not explicitly referred to a mixed motive theory, nor argued it either in his opposing brief or during oral argument.[4] Here, plaintiff has relied on the *McDonnell Douglas* framework and the pretext alternative. Accordingly, the Court will analyze the case under *McDonnell Douglas*. Nevertheless, regardless of which framework is applied, the plaintiff has submitted sufficient evidence to submit to a jury the question of whether ABM's termination of Glover was motivated, exclusively or partially, by race.

**a. Prima Facie Case**

The plaintiff bears the initial burden, namely, that of setting forth a prima facie case of unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. In order to establish a prima facie case of

---

[3]    The Court notes there has been significant debate as to whether the different proof structures just described have survived, have merged, or even apply in intentional discrimination cases, in light of the Supreme Court's *Desert Palace* holding. *See generally*, William R. Corbett, *An Allegory of the Cave and the Desert Palace*, HOUSTON L. REV.(Spring 2005). The Ninth Circuit appears to continue to recognize these proof structures, unwilling to overturn years of employment discrimination doctrine. *See Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061 (9th Cir. 2004). Though this question was not discussed by the parties, the Court finds this inquiry relevant at the summary judgment stage because *McDonnel Douglas* clearly provides for a more rigorous standard of proof than the motivating factor standard of the mixed-motive framework.

[4]    The theory a plaintiff intends to rely on need not be identified at the outset of a case or in response to a motion for summary judgment. *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1140 n. 3 (9th Cir. 2003) (citing authorities). Ultimately the Court will decide these issues when instructing the jury.

discriminatory termination through indirect evidence, an employee must show that:

(1) he belongs in a protected class;

(2) he was discharged;

(3) he was doing satisfactory work when the termination decision was made; and

(4) he was replaced by someone not in the protected class.

*McDonnell Douglas Corp.*, 411 U.S. at 802; *Chen v. State,* 86 Wn.App. 183, 189, 937 P.2d 612, review denied, 133 Wn.2d 1020 (1997). At summary judgment, the degree of proof necessary to establish a prima facie case is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) *(quoting Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994)).

The parties do not dispute the first three elements are satisfied. However, it is arguable the fourth element is not present. Defendants contend the fourth element is not met because following Glover's termination, his job responsibilities were assumed by current route supervisors, each of whom were employed by ABM at the time Glover was terminated. However, where the plaintiff's discharge is as a result of "a general reduction in the work force due to business conditions," the plaintiff does not necessarily have to establish that he was replaced by another employee. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir. 1990). Instead, plaintiff can establish a prima facie claim of discrimination by showing "circumstantial, statistical, or direct evidence giving rise to an inference of ... discrimination." *Id.* Such

an inference can be established by showing the employer had a continuing need for the plaintiff's skills and services and that a plaintiff's various duties were still being performed. *Id.*  The "burden of establishing a prima facie case is not designed to be 'onerous' and only requires the production of evidence which 'suggests' that the employment decision was based on" race. *Id.* at 1420 n. 1, quoting *Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1361 (9th Cir. 1985).

Because this case involves a reduction in workforce, plaintiff satisfies the final prong of the prima facie case by establishing that ABM had a continuing need for plaintiff's skills and services and that plaintiff's various duties were still being performed.  It is undisputed that his duties were still being performed after his termination. While it is arguable whether ABM had a continuing "need" for his services, liberally construing the facts in favor of the plaintiff, he has established the elements of a prima facie case.

**b. Defendants' Reasons for Glover's Termination**

The burden of production now shifts to ABM to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Reeves*, 530 U.S. at 142.  ABM has submitted evidence that Glover's termination was based upon a directive for an immediate ten percent reduction in personnel expenditures due to impacts on revenue on ABM caused by the 9/11 terrorist attacks at the World Trade Center.  It was thereafter agreed upon by Cain and Swinyard a supervisor position would be cut.  ABM asserts Glover was chosen because unlike the other supervisors, he did not possess a driver's license.  Facially, these reasons are both legitimate and nondiscriminatory. Thus, defendants have

met their burden of production. Having done so, the presumption of unlawful discrimination that arose with the prima facie case "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

**c. Pretext**

**i. Plaintiff's Burden of Proof**

Glover has two avenues available for showing that ABM's legitimate explanation for firing him is actually a pretext for race discrimination (1) indirectly by showing that ABM's proffered explanation is "unworthy of credence" because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer. *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1127 (9th Cir. 2000). This "shift" does not necessarily place a new burden of production on Glover. In some cases, the plaintiff's evidence establishing the prima facie case also may be sufficient to meet one or more of the elements necessary to rebut the defendant's proffered nondiscriminatory reasons. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Id.* (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089).

As in all civil cases, plaintiff may attempt to establish his case using either direct or circumstantial evidence. Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus]

without inference or presumption.' " *Godwin v. Hunt Wesson, Inc*., 150 F.3d at 1221(quoting *Davis v. Chevron, U.S.A., Inc*., 14 F.3d 1082, 1085 (5th Cir.1994)).  The Supreme Court has recently held that circumstantial and direct evidence should be treated alike, noting: "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 2154, 156 L.Ed.2d 84 (2003)(quoting *Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 508 n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)).  Despite the *Desert Palace* ruling reducing the importance of the distinction between direct and circumstantial evidence, the Ninth Circuit continues to require plaintiffs to proffer "specific" and "substantial" evidence of pretext when relying solely on circumstantial evidence.  *See Stegall v. Citadel Broadcasting Company*, 350 F.3d 1061, 1066-67 (9th Cir. 2004)(applying the specific and substantial standard though noting that *Desert Palace* may undermine the notion that one type of evidence is more probative than the other).[5]

---

[5]    This requirement would seem to demand an analysis of the proper characterization of the plaintiff's evidence.  Nevertheless, in some instances the Ninth Circuit has recently suggested this effort is wholly unnecessary since the distinction between direct and circumstantial evidence is "irrelevant to determining what analytical framework to apply" and no matter what type of evidence the plaintiff produces, the plaintiff "must produce some evidence suggesting that [the employer's decision]...was due in part or whole to discriminatory intent." *McGinest v. GTE Service Corp*, 360 F.3d 1103, 1123 (9th Cir. 2004).  At the same time, other recent Ninth Circuit cases have found the distinction between direct and circumstantial evidence "crucial, because it controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment." *Coghlan v. American Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).  The parties did not extensively brief this issue and at oral argument it became apparent the parties agreed that all of the plaintiff's evidence was circumstantial evidence.  Accordingly, the Court will not devote any further significant analysis

All of the evidence--whether direct or circumstantial- is to be considered cumulatively, not in isolation. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003).

   In addition, plaintiff's burden in this case is especially difficult because of the law of this circuit on what is known as the "same actor inference," adopted in *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267 (9th Cir. 1996) and more recently discussed in *Coughlan v. American Seafoods Company LLC*, 413 F.3d 1090, 1096-98 (9th Cir. 2005).[6] "Where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action."[7] *Coughlan*, 413 F.3d at 1096, citing *Bradley*, 104 F.3d at 270-71. The same actor inference is not a presumption. Rather, plaintiff must make out a "strong case of bias" necessary to overcome this inference.

   In this case, Glover took a leave of absence from ABM in 1997 in order to work elsewhere. In April 1998, while Glover was still on leave, Peter Cain personally contacted Glover to ask him to return to ABM to supervise

---

to this issue.

   [6] This issue was not briefed by the parties, however it was raised by the defense at oral argument. The Court does not find additional briefing on this topic necessary.

   [7] "[C]laims that employer animus exists in termination but not in hiring seem irrational. From the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir.1996)(citations, quotation marks, and brackets omitted).

ORDER - 21

the Spokane County Courthouse account, which ABM was in danger of losing due to poor performance. Glover accepted the position and in the offer of employment letter Peter Cain indicated "I am very pleased to have you as a new member of our organization." *Keller Allen Decl*, Ex. A (Glover Depos. Ex. 2). Mr. Cain also terminated Mr. Glover on October 31, 2001.[8] The Court finds the same actor inference is a "strong inference" of nondiscrimination which the Court must consider in its analysis of this summary judgment motion. *Coughlan,* 413 F.3d at 1098.

### ii. Analysis

Plaintiff has argued both that ABM's proffered reason for Glover's termination is unworthy of credence and that ABM's decision was more likely motivated by race, rather than Glover's lack of a driver's license. Glover suggests the evidence shows ABM "abruptly changed gears" giving different explanations for Glover's termination in different contexts: Glover was personally told at the time of his discharge that he was being terminated because of the events surrounding 9/11; Cain told his supervisors and the unemployment department Glover was terminated because he didn't have a driver's license; and finally, ABM told the EEOC he was terminated due to a company-wide 10% reduction in salaried personnel directive. While shifting reasons can provide a basis for finding an explanation unworthy of credence, the Court does not find ABM's reasons inconsistent with one another, and thus does not accord

---

[8] The Court finds the length of time which elapsed between Glover's re-hiring and firing is not significant in this analysis. *See discussion in Coughlan*, 413 F.3d at 1097.

this argument great weight. *Nidds v. Schindler Elevator Corp*., 113 F.3d 912, 918 (9th Cir. 1996).

As circumstantial evidence of pretext, Glover also points to the following facts, namely 1) that ABM had hired two new probationary supervisors prior to September 11, but did not fire them; 2) that in firing Glover ABM ignored its own policy of encouraging the retention of minority supervisors; 3) that ABM had always been able to accommodate Glover's lack of a driver's license and rehired him knowing he lacked a driver's license; 4) that Glover had received excellent reviews and was highly experienced; 5) that Glover was terminated without warning; 6) that ABM terminated Glover one month prior to the date the cutbacks were to be effective according to the McClure directive; 7) that ABM failed to provide "pay in lieu of notice" as offered as an option in the McClure directive; 8) that ABM did not follow internal procedures in failing to complete a "Work Force Analysis" form or "Staffing Needs Worksheet"; 9) that Glover was terminated without notice and without severance pay; 10) that the Spokane branch's supervisor budget increased the next year; and 11) that ABM treated Jessica Miller, a white ABM employee in Colville, differently in implementing the 10% reduction choosing to "jointly [come] up with something" which allowed her to remain an employee.

ABM has attempted to offer explanations for and minimize the importance of each of these facts. While each piece of evidence in isolation is perhaps not highly probative circumstantial evidence, nor sufficient on its own to establish discriminatory intent, considering the evidence cumulatively, it certainly provides some circumstantial evidence of pretext. All of this evidence, considered along with plaintiff's

evidence of Cain's discriminatory animus, which the Court will now address, all culminate in the conclusion that Glover has presented sufficient evidence to withstand summary judgment.

Here, the evidence of record also includes the allegation that Cain told the jokes "What do you call a 19 year old black man in fourth grade? Gifted." and "What do you call a black man in the tree with monkeys? Branch Manager" to another ABM employee in 1996.[9]  The evidence also includes the allegation that Cain discussed with Jim Thomas "having difficulties with black supervisors in Spokane" and indicated "he wished that he could move one of the supervisors up to Priest River to get him out of the way, but that he doubted he could get away with that in North Idaho."  It is alleged Cain told Thomas he was lucky he lived in Idaho "since there were no blacks there and we did not have to deal with those problems."

When analyzing whether these remarks are sufficient to allow a reasonable jury to find pretext the Court generally considers whether the remarks are related to the protected class of persons of which plaintiff is a member, whether the remarks were proximate in time to the employment

---

[9]     Defendants suggest this evidence is outside the statute of limitations governing Mr. Glover's claims, suggesting the Court should not consider the evidence. While the statute of limitations for filing a charge of discrimination based on this evidence may have been barred the Court's consideration of any such claim, it does not prevent the Court from considering the jokes as circumstantial evidence of racial animus in determining whether the plaintiff has raised a question of pretext or discriminatory intent. *Heyne v. Caruso*, 69 F.3d 1475, 1479 (9th Cir. 1995)("It is clear an employer's conduct tending to demonstrate hostility towards a certain group is both relevant and admissible where the employer's general hostility towards that group is the true reason behind firing an employee who is a member of that group.").

decision, whether the remarks were made by persons who participated in the decisions, and whether the alleged remarks were related to the employment decision. *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999). It is undisputed the alleged comments were related to the African-American race. Notably, Cain allegedly told the jokes over four years prior to Glover's termination. They also were made prior to Cain's 1998 active recruitment and re-hiring of Glover. It is unclear when the remarks were allegedly made to Thomas. The jokes were not told in Glover's presence, nor directed to Glover.[10] Nevertheless, unlike the stray remarks at issue in *Nesbit v. Pepsico Inc.*, 994 F.2d 703, 705 (9th Cir.1993) (per curiam), and *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 915, 918-19 (9th Cir.1996), Cain's jokes were not generic or ambiguous comments about African-Americans. Instead, both jokes were allegedly told to an ABM in a work context and at least one joke involved comments pertaining to  African-American employees (branch managers). The comments to Thomas dealt specifically with the workplace, a person of Glover's race, and Glover's position with ABM in the Spokane branch. Drawing all inferences in favor of the plaintiff, these comments, in combination, give rise to an inference of racial animus.

Defendants have argued there is no nexus between the alleged comments and the employment decision to terminate Glover, and therefore the evidence is insufficient to sustain the plaintiff on summary judgment.

---

[10] *But see Coghlan*, 413 F.3d at 1095 n. 6 (holding that even if an employer does not target his remarks directly at the plaintiff, "when evidence establishes the employer's animus toward the class to which the plaintiff belongs, the inference to the fact of discrimination against the plaintiff is sufficiently small that we have treated the evidence as direct").

However, there is an important nexus in this case, which distinguishes this case from the case cited by defense counsel at oral argument, *Griffith v. Schnitzer Steel Industries, Inc.*, 2005 WL 1669473 (Wash.App.Div. 2 2005). All of the comments were allegedly made by Cain, the Spokane branch manager who was Glover's direct supervisor and who was the primary decisionmaker in choosing to terminate Glover. The Ninth Circuit has recently held "where a decisionmaker makes a discriminatory remark against a member of the plaintiff's class, a reasonable factfinder may conclude that discriminatory animus played a role in the challenged decision." *Dominguez-Curry v. Nevada Transportation Department*, 2005 WL 2218908, *9 (9th Cir. 2005). Moreover, the *Dominguez-Curry* Court noted that the Ninth Circuit has repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer. *Id.* (citing cases). The fact that the comments were allegedly made by Cain, Glover's immediate supervisor and a decision-maker, that they specifically negatively and derogatorily reference African-Americans, is sufficient to permit a jury to find that animus affected the ultimate firing decision, even if Cain did not communicate any bias to Glover. *Id*.

**d. Conclusion**

The Ninth Circuit has held that "very little[ ] evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a fact-finder." *Schnidrig v. Columbia Mach., Inc.,* 80 F.3d 1406, 1409 (9th Cir. 1996). "When [the] evidence, direct or circumstantial, consists of more than the McDonnell Douglas presumption,

a factual question will almost always exist with respect to any claim of a nondiscriminatory reason." *Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th 1991); see also *Lam v. University of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994).

This is a close case, especially in light of the same actor inference present here. "Employment discrimination cases inevitably present difficult problems of proof, because we cannot peer into the minds of decisionmakers to determine their true motivations." *Coghlan v. American Seafoods Co.*, 413 F.3d 1090, 1100 (9th Cir. 2005). However, such uncertainty at the summary judgment stage must be resolved in favor of the plaintiff. *Sischo-Nownejad*, 934 F.2d at 1111 ("We require very little evidence to survive summary judgment precisely because the ultimate question is one that can only be resolved through a 'searching inquiry'--one that is most appropriately conducted by the fact finder, upon a full record."). Because a number of factors cast doubt upon ABM's proffered explanation for its termination of Glover and disputed evidence suggests discriminatory animus could have affected the employment decision, Glover has met his burden of showing a genuine factual issue with regard to discriminatory intent.

Additionally, although plaintiff does not expressly designate his case as a "mixed-motive" case, the record reveals that it could be possibly construed as one. Here, the evidence ultimately may permit a finding that ABM had a legitimate reason for firing Glover. However, because a reasonable factfinder could conclude the firing decision was motivated at least in part by his race, summary judgment must be denied. *See Dominguez-Curry*, 2005 WL 2218908, *10 (9th Cir. 2005); *Stegall v. Citadel*

*Broadcasting Co.*, 350 F.3d 1061, 1072 (9th Cir.2004) (as amended) (noting that whether her case is analyzed as a single-motive or mixed-motives case, the plaintiff was entitled to a trial on her Title VII claim because the record revealed "a triable issue as to whether Stegall's termination was influenced by improper motives").

**2. <u>Hostile Work Environment / Racial Harassment</u>**

Section 1981 and the WLAD's prohibition against race discrimination in the workplace also encompasses employment discrimination stemming from a hostile work environment. *Manatt v. Bank of Am.*, 339 F.3d 792, 797 (9th Cir. 2003). To survive summary judgment, Glover must show that

> (1) ABM subjected him to verbal or physical conduct of a racial nature,
> (2) that was unwelcome, and
> (3) "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment."

*Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2004); *Glasgow v. Georgia-Pacific Corp.,* 103 Wn.2d 401, 406-07, 693 P.2d 708 (1985)). Casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law. *Id.*

To determine whether conduct was sufficiently severe or pervasive to violate federal law, the court must consider "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (*quoting Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). The conduct at issue must be perceived as abusive, both subjectively from Glover's

perspective and objectively from the perspective of a reasonable African-American. *McGinest*, 360 F.3d at 1115.

Glover admitted in his deposition that he had no complaints or problems regarding his employment with ABM prior to his leave of absence in 1997. He never heard anyone make racial jokes or comments about or to him. The only basis for this claim are two occasions in which it is allegedly Cain yelled at him for problems with the condition of two worksites. Glover admits Cain did not use profanity or anything of personal nature to him during these alleged incidents. He never reported the incidents because he "did not think it was a big deal at the time." DSMF ¶ 15. Though in retrospect, Glover now believes he was treated more harshly than other white supervisors, this assertion is unsupported by the record.

Drawing all reasonable inferences in favor of Glover, the evidence is insufficient to avoid summary judgment on the hostile work environment claim in Washington or the Ninth Circuit. *Vasquez*, 349 F.3d at 643-44 (reviewing case law and finding that alleged harassing conduct, including two racial epithets directed at the plaintiff, was insufficient to create a hostile work environment); compare *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864, 870 (9th Cir. 2001) (hostile work environment existed where male plaintiff subjected to relentless insults, name-calling, and vulgarities, including taunts of "faggot" and "f--king female whore"). Specifically, there is insufficient evidence of verbal or physical conduct of racial nature directed at and *perceived by* Glover. Similarly, there is no evidence that any such conduct was sufficiently pervasive

that it altered the conditions of employment and created an abusive working environment.

**C. Discharge in Violation of Public Policy**

To create a prima facie case for the tort of wrongful discharge in violation of public policy, the plaintiff must first prove the existence of a clear, relevant public policy. *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996). Second, the plaintiff must show that discouraging his or her conduct would jeopardize that public policy. *Gardner*, 128 Wn.2d at 941. Third, the public-policy-linked conduct must have caused the dismissal. *Id.* And fourth, the employer must not have an overriding justification for the dismissal. *Id.*

Washington's Law against Discrimination establishes a clear mandate of public policy. *Sedlacek v. Hillis,* 145 Wash.2d 379, 385-86 36 P.3d 1014 (Wash. 2001). Firing someone who is a member of the class protected by RCW 49.60.180 would jeopardize the public policy against discrimination. Accordingly, this claim is necessarily predicated Glover's claim of race discrimination. Because a question of fact remains as to whether Glover was discharged because of his race, Glover's claim for wrongful discharge in violation of public policy also survives the motion for summary dismissal.

**D. Washington Wage and Hour Act**

Plaintiff's complaint alleges defendants intentionally withheld wages from the plaintiff in violation of the Washington Wage and Hour Act, RCW 49.48 et seq. (attorney fees for successful recovery of wages or salary) and RCW 49.52 et seq (any employer who willfully refuses to pay an employee's wages is liable for twice the wages unlawfully withheld,

1    together with the costs of the suit and reasonable attorney fees).

2    Glover testified in his deposition that his final paycheck appeared to

3    be correct, and the he had been paid for all the time he had worked up

4    to the point of his lay off.  Keller Allen Decl. Ex. A, Glover Dep. at

5    93.  Defendants argue since there is no evidence of wrongful withholding

6    of wages, his claim must be dismissed as Washington Courts do not extend

7    double damages to situations where employers allegedly violate anti-

8    discrimination statutes. *Hemmings v. Tidymans, Inc.*, 285 F.3d 1174 (9th

9    Cir. 2002), cert. den. 537 U.S. 1110 (2003).

10    *Hemmings* is controlling here. Violations of § 49.52 have been upheld

11    where an employer consciously withholds a quantifiable and undisputed

12    amount of *accrued* pay.   According to *Hemmings*, RCW 49.52.050 applies

13    only when an employer has a pre-existing duty under contract or statute

14    to pay a specific compensation. *Id*. When the employer's obligation to pay

15    a specific amount does not legally accrue until a jury verdict, the

16    employer cannot be said to have consciously withheld a quantifiable and

17    undisputed amount of accrued pay. *Id. at 1203.*

18    *Hemmings* was not rejected by the case of *Allstot v. Edwards*, 114

19    Wn.App. 625 (2002), as contended by plaintiff, though *Allstot* did point

20    out the strong dissent in *Hemmings*.   114 Wn.App. At 634-35. Notably,

21    *Allstot* is also distinguishable from this case because it involved a

22    wrongfully terminated civil service employee, who according to statute,

23    was required to be reinstated with pay from the time of dismissal.  Thus,

24    in *Allstot* the "obligation" to pay back wages arose from statute.  Such

25    circumstances do not exist here.   As in *Hemmings*, Glover cannot

26    demonstrate an obligation to pay other than by jury verdict in this case.

ORDER - 31

1  Accordingly, double damages are not recoverable.  Plaintiff's Wage and
2  Hour Act claim is also dismissed.

3  **E.  Negligent Hiring and/or Supervision**

4  Plaintiff's fifth cause of action asserts a claim for negligence in
5  the hiring and supervision of Peter Cain.   It appears plaintiff has
6  abandoned or conceded the summary dismissal of this claim, as the
7  plaintiff did not address the claim in his opposition brief.
8  Nevertheless, Glover relies upon the same facts as his discrimination
9  claim to support this claim.  The same facts cannot be relied upon to
10 support both a RCW 49.60 discrimination claim and a negligence claim.
11 *Francom v. Costco Wholesale Corp.*, 98 Wn.App. 845, 864-66 (2000)
12 (affirming the dismissal of negligent infliction of emotional distress
13 and negligent supervision when the claims arose from the same facts
14 alleged they based their discrimination claim upon).   Accordingly,
15 Glover's negligence claim is dismissed.

16 **F. Judicial Estoppel Defense**

17 Alternatively, defendants seek dismissal of plaintiff's claims on the
18 grounds that Glover should be judicially estopped from raising these
19 claims as a punishment for "attempting to use the bankruptcy courts to
20 his own unfair advantage." In October 2003, Glover filed for Chapter 7
21 bankruptcy protection. His attorney at the time did not list this
22 wrongful termination lawsuit as a contingent claim, though it was listed
23 on the Statement of Financial affairs.  Glover's debt was discharged as
24 a no asset estate on January 1, 2004.   After learning of the
25 discrepancies, Glover's litigation attorneys moved the bankruptcy court
26 to reopen the bankruptcy.  It was reopened and the schedules were

1  amended.   Accordingly,  the  Court  finds  no  legal  merit  to  defendant's

2  judicial estoppel defense.

3  **V.        CONCLUSION**

4     Based  upon  the  reasons  and  authorities  cited  above**, IT  IS  HEREBY**

5  **ORDERED:**

6     1.    Plaintiff's Motion for 56(f) Continuance (Ct. Rec. 88) is **DENIED**

7  as **MOOT**.

8     2.    Defendants' Motion to Strike Inadmissible Evidence (Ct. Rec.

9  101) is **GRANTED** IN PART and **DENIED** IN PART.

10    3.    Defendants' Motion for Summary Judgment (Ct. Rec. 55) **GRANTED IN**

11 **PART** and **DENIED IN PART** as set forth above.

12    The  District  Court  Executive  is  directed  to  enter  this  order  and

13 forward copies to counsel.

14    DATED this 6th day of October, 2005.

15

16                              s/Lonny R. Suko

17           _____

18                    LONNY R. SUKO
               United States District Judge

19

20

21

22

23

24

25

26

ORDER - 33